ANDRE R. LARDY and JOAN P. LARDY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lardy v. Commissioner
Docket Nos. 9692-78, 5268-79.
United States Tax Court
T.C. Memo 1980-468; 1980 Tax Ct. Memo LEXIS 117; 41 T.C.M. (CCH) 217; T.C.M. (RIA) 80468; October 21, 1980, Filed W. Keith Woodmansee, for the petitioners. Henry E. O'Neill, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax in the amounts of $1,471, $1,780, $1,452, and $742 for the calendar years 1973, 1974, 1975, and 1976, respectively. The issues for decision are (1) whether amounts paid by petitioners during the years 1973 through 1976 in connection with the construction of a sailboat are deductible as business expenses under section 162, I.R.C. 1954, [1] or as expenses for the management, conservation or maintenance of property held for the production of income under section 212, or are capital expenditures; and (2) whether all of the amounts claimed to be deductible by petitioners in the years here in issue have been properly substantiated. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Spain at *119 the time of the filing of their petition in this case, filed a joint Federal income tax return for each of the calendar years 1973, 1974, 1975 and 1976. Andre Lardy (petitioner) has been interested in sailing and sailboats all his life. In 1954, petitioner worked in several boat yards performing boat repairs and finishing. From 1960 through 1962 he owned and operated a boat maintenance and repair business in Sausalito, California. From 1963 to 1972 petitioner owned and operated a business in Sausalito called "Cars-In-Europe." This business engaged in the sale of cars to persons traveling abroad for delivery in Europe. Petitioner was a friend of Irving Johnson, owner of the sailboat Yankee. The Yankee is a world-renowned sailboat which was featured in articles in National Geographic Magazine and on television specials. From sometime prior to 1969, the Yankee had been extensively chartered for cruises through inland waterways of Europe. At times there was a 4-year waiting list for charter cruises on the Yankee. For a number of years prior to 1969, petitioner had wanted to have designed and to build a sailing vessel. He had an idea for a vessel which would *120 be unsinkable and would be able to turn within its own length. Petitioner planned a vessel which would have masts comparable to those on the Yankee which would fold down for cruising in the European inland waterways under low permanent bridges. Petitioner was of the opinion that if he could construct a boat of the type he had in mind to use as a prototype, he would be able to sell his services for supervision of construction of a boat of the same type, or a "sister" boat, to a number of individuals and that he would obtain fees for his services in supervising the construction of "sister" boats. He was also of the opinion that he could use the boat he constructed for charters as the Yankee was used and make profits from this operation. In 1969 petitioner sold a house which he had built in Lake Tahoe at a profit and decided to use the funds to commence the construction of his prototype boat. In April 1969 he secured a California certificate for transacting business under a fictitious name--Ocean Safe Yachts. In May, petitioner went to Holland and engaged an naval architect to make the sail plan (drawing) of a prototype sailing ketch which petitioner planned to name the *121 Sagesse. While in Holland he contracted for the construction of a steel hull for the boat. The hull was constructed in Holland and launched in 1970. Safety was a primarly considration of petitioner in the construction of the Sagesse, and the unsinkable quality of the hull was the inspiration for the name Ocean Safe Yachts. The design of the Sagesse was somewhat similar to that of the Yankee, including a hinged mast. At the time petitioner began the construction of the Sagesse he anticipated completing the ship in approximately 2 years. In fact, at the end of 1970 petitioner sent a Christmas-New Year message to friends and customers of his Cars-In-Europe business discussing the launching of the hull for the 53-foot ketch. He discussed in some detail the type of sailboat the Sagesse would be. He stated that it was one of the few yachts ever built specifically for the double purpose of exploring inland waterways as well as open sea navigation. He referred to the cruises offered by the Yankee and then stated: Since the completion of the construction is scheduled for the end of 1971, the enjoyment of crusing the fascinating canals and rivers of Europe *122 begins in 1972. It is our hope that you will want to charter with us and leisurely share the enjoyment of mile upon mile of wonderful scenic smooth travel off the crowded roads. Ocean Safe Yachts, which I founded in 1969 to build this charter prototype also accepts orders for sister-ships to be built; as well our services can be retained for the supervision and coordination of the construction of any new boat of any other design. Soon I will commercial this new exclusive feature of hull structure making any vessel of any size virtually unsinkable. Each Christmas we shall send you a similar news letter telling you of our cruising adventures with our charter guests. The construction of the Sagesse did not proceed as rapidly as petitioner had anticipated. After the launching of the hull in 1970, petitioner returned to California to operate Cars-In-Europe. He sold the Cars-In-Europe business in 1972 and used the profit from the sale in connection with the construction of the Sagesse. However, from 1970 until the time of the sale of the Cars-In-Europe business in 1972, petitioner would travel to Europe in connection with construction of the Sagesse. In the fall *123 of 1972, the unfinished Sagesse was removed from Holland to Great Britain for the installation of marine diesel engines in the boat and for sea trials. By 1974 the Sagesse could be taken to sea, but much work remained to be done on the boat and the boat was not completed until 1977. Petitioner is a skilled craftsman and did much of the finishing work on the Sagesse himself. Mrs. Lardy is a flight attendant for Pan American Airways. She would obtain materials for the boat and bring them to petitioner from time to time and also helped with the work on the boat from time to time. After petitioner sold the Cars-In-Europe business he purchased a caravan in which to live in England while the diesel engines were being placed in the Sagesse. The hull had been towed from Holland to England for the mechanical installations. By 1974 petitioner was able to live on the unfinished boat and he did live on the boat from sometime in 1974 throughout the years here in issue while completing its construction. Mrs. Lardy maintained an apartment during part of this time in Sausalito, California and later, when she was transferred to fly out of London by Pan American, maintained an *124 apartment there. In the years following 1970, petitioners continued to send Christmas letters to their friends and customers or former customers of the Cars-In-Europe business. In the 1971 letter, petitioners stated in part: This explains why at $950 per week per couple, Yankee is always booked long in advance and the Johnsons are turning down new inquiries. It also explains why one of the world's largest international wholesale tour and travel operators is begging us to give them the exclusive listing to represent Sagesse for charter in Europe. The only reason for not having completed the construction of Sagesse this year is that I must first sell my tourist car order agency. In the 1972 Christmas letter petitioners stated in part: Since beside accepting orders for sister-ships, we are planning to have this forst [sic] yacht operational for charter on the inland waterways of Europe for the 1974 season, we shall soon be open to accept booking reservations. We will keep you informed. In the 1973 Christmas letter petitioners stated in part: If you have some nature loving, non smoker friends, interested in joining us as charter guests for a portion of our scenic *125 cruise on the inland waterways of Europe, we still have some vacancies from June/July onward. The inquiries should be addressed to us at P.O. Box 559, Sausalito, CA.94965. Some people may enjoy it so much that they may want to own a sistership of SAGESSE, either for private use or profitable chartering. As you know the production of sisterships is the main purpose of OCEAN SAFE YACHTS. Petitioners' 1974 Christmas letter stated in part: We hope that all of you who want to join us during a part of the next season [to] enjoy a week or more of the most comfortable and scenic cruising any yachting can offer, will understand the importance of contacting us soon for arrangements. We will be looking forward to seeing you on board, as SAGESSE will cruise inland on the small canals of France, Belgium, Holland, Germany and Denmark, exploring the real country off the tourist routes. For your comfort and good health you will appreciate to know that SAGESSE will only welcome non smokers. At the end of this 1974 letter appeared petitioner's name, Ocean Safe Yachts, and a post office box and telephone number in Sausalito, California. The 197l Christmas letter referred to an illness *126 having incapacitated petitioner for work during part of the year. This letter stated in part: Of course, when you will be ordering your sistership of Sagesse, we will gladly accommodate your requirements for the interior and please your taste with the hull colors of your choice. Early in the spring we will inform you of the places and dates Sagesse can welcome you. This letter also at the bottom had petitioner's name, the trade name Ocean Safe Yachts, and the post office box address and telephone number in Sausalito, California. The 1977 letter stated in part: OCEAN SAFE YACHTS is now ready to present and demonstrate this prototype to those of you contemplating the acquisition of a sistership. The non smoking regulation strictly enforced on board Sagesse is an option on sisterships! … For 1978 our sailing plans are to explore many countries of Europe via the scenic inland waterways. Please contact us at your earliest convenience if you or friends you may refer plan to join us between March and November. All of the letters referred to Mrs. Lardy's contribution to the construction of the Sagesse through designing and selection of upholstery and in various other *127 ways. The first income generated by Ocean Safe Yachts was in 1978 in connection with three charter parties. The amounts of income and length of charter are as follows: Charter (2 persons - one week)
$1,350.00
Charter (2 persons - one week)
1,012.50
Charter (1 person - two weeks -
special discount)
1,120.50
Total
$3,483.00
In 1973 petitioner registered in England as a boat builder. Because of this registration he was able to acquire some of the material for building the Sagesse at a boat builder's discount. In January 1976 petitioner was hospitalized in Geneva, Switzerland for a period of approximately one month. Following his release from the hospital and during his convalescence he was unable to work on the boat for approximately 3 months. At the date of the trial, no sister ships of the Sagesse had been commissioned. At the time petitioner was constructing the Sagesse, a sister ship to the Sagesse would have cost in the area of $150,000 to $200,000. During all of the years here in issue petitioner had no intention of selling the Sagesse but intended to use it as a demonstrator to persons interested in commissioning him *128 to supervise construction of a sister ship and for charter parties. In 1978 petitioner had a serious illness which affected his ability to use his legs. As a consequence petitioner doubted his ability to physically operate the Sagesse on charter trips himself and at the time of the trial of this case was considering for the first time the possibility of selling the ship rather than keeping it for use in his business as he had planned from the start of its construction. In 1977 and 1978, petitioner's activities with respect to the building of the Sagesse and its availability for charter were the subject of several articles in newspapers and other periodicals. During this period of time petitioner gave talks with slides at a number of places to interest people in chartering the Sagesse and had brochures about the Sagesse printed. One of the articles about the Sagesse that appeared in The Travel Agent was entitled "A New Way to Tour Europe--By Yacht." Another article which appeared in a newspaper was entitled "Dream Journey Organizer Seeks Some Shipmates." This article carried a picture of petitioner. Another article was entitled "Yacht to Traverse Europe's *129 Waterways." The New York Times in its Sunday, March 19, 1978, edition had an article "A Leisurely Way to Tour Europe" which referred to a cost of $675 per person in double occupancies on petitioner's yacht, the Sagesse. Several of the articles were about travel talks given by petitioner. The brochures printed by petitioner contained sketches of the cabins in the yacht and maps of the areas of the inland waterways traveled. They also referred to the rates charged for a one-week trip. Petitioners on their tax returns for the calendar years 1973 through 1976 claimed the following losses in connection with the activities of Ocean Safe Yachts: Year [2]
Receipts
Expenses
Loss
1973
0
$8,312
[8,312)
1974
0
9,769
(9,769)
1975
0
8,265
(8,265)
1976
0
5,847
(5,847)
*130 Respondent in his notice of deficiency to petitioners for the years 1973 and 1974 disallowed the claimed expense deductions with the following explanation: (a) Business Expenses The deductions totaling $8,312 and $9,769 reported on your 1973 and 1974 returns, respectively, as expenses for the activity Ocean Safe Yachts are not allowed. You have not established that you incurred or paid expenses in the total amounts reported in 1973 and 1974 or, if expended, that such expenditures qualify as ordinary and necessary business expenses of carrying on a trade or business in 1973 and 1974 within the meaning of section 162 of the Internal Revenue Code. You have not established that such expenditures qualify as ordinary and necessary expenses for production of income or for management, conservation, or maintenance of property held for production of income during 1973 and 1974. (b) Interest Expense A deduction for personal interest expenses, authorized under section 163 of the Internal Revenue Code, is allowed in the amount of $1,625 for 1973 and $1,920 for 1974. For the years 1975 and 1976, respondent disallowed deductions claimed *131 by petitioner in connection with Ocean Safe Yachts in the amounts of $6,715 and $3,927, respectively, with the following explanation: It is determined that the following schedule of expenses for the development and construction of the yacht, "Sagesse" are not deductible within section 162 or section 212 of the Internal Revenue Code. It is also determined that, with the exception of the entertainment and promotion expenses, the remainder of the expenses are capital expenditures within section 263 of the Internal Revenue Code. In further explanation, respondent referred to the interest expense deduction in each of these years which was not disallowed as "properly Sched. A." OPINION Section 162 provides for the deduction of all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Section 212 provides that in the case of an individual there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection *132 of income or for the management, conservation, or maintenance of property held for the production of income. Section 263(a) provides, with respect to capital expenditures, that no deduction shall be allowed for any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate with certain exceptions not here pertinent. Petitioner argues that since he entered into the construction of the Sagesse for the business purpose of having a prototype ship to demonstrate to prospective customers for his services in supervising the construction of sister ships and for the purpose of taking charter passengers on cruises through Europe, the expenditures here involved are ordinary and necessary business expenses. In the alternative, petitioner argues that these amounts were expended for the conservation or maintenance of property held for the production of income. Respondent takes the position that petitioner's activities were engaged in as a hobby and, in the alternative, aruges that they were engaged in for the purpose of constructing a ship to be used in a future trade or business. Without any detailed discussion, *133 we conclude from the facts we have found that petitioner was building the Sagesse in order to use it in a business operation of transporting charter parties and of demonstrating to prospective customers for his services in supervising construction of a comparable yacht. However, in our view the amounts expended by petitioner during the years here in issue in connection with the work on the Sagesse are primarily properly to be considered as a cost of the construction of the ship. The major portion of the expenses claimed to be deductible were expenses in connection with petitioner's travel and living in Europe so that he could work on the boat, or for dock fees for the boat, or automobile expenses or Mrs. Lardy's travel to Europe. Since petitioner's entire activities, other than strictly personal activities in the years here in issue, were in working on the boat, the claimed deductions appear to be primarily for expenses of constructing the Sagesse. The ship was to be the asset used by petitioner in the trade or business which would be engaged in by Ocean Safe Yachts. Therefore, any cost in connection with the Sagesse in the years here in issue, including the depreciation *134 claimed by petitioner on the tools, the automobiles and the caravan in which petitioner lived in England, are part of the construction costs of the Sagesse and must be capitalized. Commissioner v. Idaho Power Co., 418 U.S. 1 (1974), affg. a Memorandum Opinion of this Court. Since most of the expenses here involved are directly connected with the construction of the Sagesse, under the holding in Idaho Power Co., supra, they are capital expenditures. In that case the Court stated (at 12): Accepted accounting practice and established tax principles require the capitalization of the cost of acquiring a capital asset. * * * This principle has obvious application to the acquisition of a capital asset by purchase, but it has been applied, as well, to the costs incurred in a taxpayer's construction of capital facilities. * * * [Footnote omitted.] A minor part of the expenses claimed to be deductible in each year were in connection with advertising. [3] Although the record is not clear as to the items included under advertising expenses, it is clear that petitioner's *135 sole occupation during the years here in issue was in the building of the Sagesse, which he planned to use in his business when it was completed. Therefore, to the extent that the claimed advertising expenses were not directly related to the construction of the Sagesse, they were pre-operating expenses for a business to be conducted in the future. Such pre-operating expenses are capital expenditures and not deductible expenses. See Polachek v. Commissioner, 22 T.C. 858, 863 (1954); Richmond Television Corp. v. United States, 345 F.2d 901 (4th Cir. 1965), remanded on other grounds 382 U.S. 68 (1965). While in our view petitioner has not shown any part of the claimed expenses to be expenses of carrying on a business in the years here in issue, if the amounts claimed to be deductible for entertainment were to be so considered, they would not be deductible because they have not been substantiated as required by section 274(d). As above *136 stated, in our view the travel expenses claimed to be deductible are a part of the construction costs of the Sagesse. The record shows Mrs. Lardy came to where the Sagesse was located to assist in the decorating and construction of the Sagesse. However, to the extent that any amount claimed as travel expenses might be considered to be a business expense, the record is devoid of substantiation of such claimed deductions under section 274(d).
In our view, petitioners totally misconstrue the provisions of section 212. That section provides for a deduction for the management, conservation, or maintenance of property held for the production of income, not for the purchase or construction of such property. Section 263(a), in providing that no deduction shall be allowed for amounts paid out for permanent improvements or betterments made to increase the value of any property, makes it clear that section 212 was not intended to allow a deduction for the cost of constructing a property to be used in a trade or business. On the facts of this case, we hold that petititoners have failed *137 to show that any of the claimed deductions in connection with Ocean Safe Yachts which were disallowed by respondent are properly deductible either under section 162 or section 212. Decision will be entered for the respondent. Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the years in issue.↩
2. The detail of the deductions claimed for each of these years is stipulated in paragraph 16 of the stipulation of facts. Since we have found these facts as stipulated, we have not detailed these expenses. However, it is noted that certain of the expenses pertain to entertainment and Mrs. Lardy's travel in Europe and, for the years 1973, 1974 and 1975, a portion of the rent paid by petitioners on the Sausalito apartment.↩
3. The amounts of $214 in 1974 and $7.18 in 1975 were claimed to be deductible as advertising.↩